894 So.2d 1160 (2005)
Elton THOMAS and Judy T. Routzahn, Individually and on Behalf of all Other Shareholders of North 40 Land Development, Inc.
v.
NORTH 40 LAND DEVELOPMENT, INC. and Darold D. Sercovich, Sr., Kim Chandler and Jesuit Bend Lands, Inc.
No. 2004-CA-0610.
Court of Appeal of Louisiana, Fourth Circuit.
January 26, 2005.
*1162 Robert A. Mathis, Newman, Mathis, Brady & Spedale, APLC, Metairie, Counsel for Defendants/Appellees (Iberiabank and Iberia Jesuit Property, Inc.).
Geoffrey H. Longenecker, Longenecker & Associates, Ltd., Covington, Francis J. Lobrano, Joyce Cossich Lobrano, Lobrano & Lobrano, Belle Chasse, Counsel for Defendants/Appellants (Gary T. Sercovich, Individually, and on Behalf of North 40 Land Development, Inc.).
Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, Sr.
MURRAY, J.
This is a shareholders' derivative action. This action was brought originally by two of the three shareholders of North 40 Land Development, Inc. ("North 40"), Elton Thomas and his daughter, Judy Routzahn, against, among others, the third North 40 shareholder, Darold Sercovich, Sr. ("DD"); Kim Chandler, an officer of North 40; and DD's wholly owned corporation, Jesuit Bend Lands, Inc. ("Jesuit Bend")(the "Thomas Derivative Action"). The Thomas Derivative Action culminated in a settlement agreement, which partially resolved the suit. Following the settlement, Gary Sercovich ("GS"), DD's brother, intervened in the suit as either a pledgee or an owner of DD's North 40 stock. In his intervention, GS named as additional *1163 defendants Iberiabank Corporation ("Iberiabank") and Iberia Jesuit Property, Inc. ("Iberia Jesuit")(collectively the "Iberiabank Defendants"). Among the claims he asserted against the Iberiabank Defendants were conspiracy to commit fraud and racketeering. GS appeals the trial court's decision granting the Iberia Defendants' motion for partial summary judgment dismissing those two claims. For the reasons that follow, we affirm.

FACTUAL BACKGROUND
This case arises, in general, out of the on-going banking relationship between Iberiabank and Jesuit Bend, and, in particular, out of the December 12, 1997 loan transaction between them. To place this matter in context requires a detailed review of the facts.
In March 28, 1996, North 40 issued three stock certificates. Two of the certificates were for 125 shares and represented a 25% interest in North 40. Those two certificates were issued to Mr. Thomas and his daughter, Ms. Routzahn. The third certificate was for 250 shares and represented a 50% interest in North 40. The third certificate was issued to DD. On October 15, 1997, DD pledged his certificate to his brother, GS. As noted, GS intervened in this action as either a pledgee or an owner of DD's certificate.
Both North 40 and Jesuit Bend (DD's wholly owned corporation) are in the real estate development business. In 1996, North 40 borrowed $3.4 million from Whitney National Bank to develop the Pleasant Ridge Estates, which consisted of eighty-five lots (the "Pleasant Ridge Project"). In July 1997, Jesuit Bend borrowed $1,325,000 from Iberiabank to develop the Riverbend Place Subdivision (the "Riverbend Project").[1] In December 1997, DD approached Iberiabank about funding Jesuit Bend's take over of North 40's Pleasant Ridge Project. At that time, forty-two of the eighty-five Pleasant Ridge lots had been sold, leaving forty-three unsold lots, and the Whitney Bank loan had a balance of about $1.1 million.
The Iberiabank loan officer who handled both the Pleasant Ridge and the Riverbend loan was Gary Gilbert. In his December 2, 1997 memorandum labeled "Officer's Comments," Mr. Gilbert noted the following pertinent background information regarding the Pleasant Ridge loan:
 In September 1996, the principal, DD, began the development of Pleasant Ridge Estates in Belle Chase, Louisiana. The company which presently owns the development is North 40. This company is owned by DD (75%) and by Mr. Thomas (25%).[2] This company obtained a $3.4 million development loan at the Whitney to establish an 85 lot upscale residential development. Since January 1997, the company has sold 42 lots, and it has reduced the principal balance on the loan to $1.4 million currently.
 With our loan facility, GS will buyout his partner and refinance the Whitney debt. He is seeking a one-year loan. The principal will be repaid as each lot is sold. Eighty percent of the sales price is applied to the loan balance, five *1164 percent goes into an interest reserve account and fifteen percent goes to the borrower to pay commissions and closing costs. At an average sales price of $75,000, the loan, based on the above distribution, will be repaid after the sale of 22 lots.
 In order for the borrower to pledge the Pleasant Ridge property, North 40 must transfer ownership to Jesuit Bend. While the exact procedure has not been finalized, North 40 will probably donate the property on a tax-free basis to Jesuit Bend in exchange for the buyout agreement for Mr. Thomas.
As the latter statement acknowledged, a condition precedent to the Pleasant Ridge loan was that North 40 transfer title to the unsold Pleasant Ridge lots to Jesuit Bend so that Jesuit Bend could pledge those lots as collateral. On this point, Mr. Gilbert's memorandum also stated that "[t]his [transfer] is to be accomplished on a basis which precludes a taxable event." When questioned about these statements regarding the tax-free nature of this transfer from North 40 to Jesuit Bend, Mr. Gilbert replied:
"[T]hat was D.D.'s explanation as to, you know, how the transaction was going to, occur. And that  that what he was dealing with, that Elton [Thomas] was seeking some sort of tax advantage. It really wasn't tax-free. It really should have been tax-deferred  tax-deferred basis  and that was what he was seeking. That was what Elton [Thomas] was seeking according to D.D."
According to Mr. Gilbert's memorandum, the details of the Pleasant Ridge loan transaction were that Jesuit Bend was "seeking to refinance existing debt on the Pleasant Ridge Estates subdivision at the Whitney National Bank in the amount of approximately $1.1 million" and "to buyout his partner [Mr. Thomas] with a combination of cash and lots." Explaining the latter purpose, his memorandum further stated that DD "is seeking to borrow $200,000 to pay this cash portion and designate 10 lots for the partner. This method of payment reduces the amount of cash needed for the buyout." His memorandum further stated that the loan would be collateralized by thirty residential lots that have an aggregate appraised value of $2,534,500, which established a loan-to-value of 51.3%.
Mr. Gilbert's handwritten notes from his initial conversation with DD regarding the Pleasant Ridge loan likewise document that DD's initial request was to borrow $1.3 million for two purposes: (1) to pay off the Whitney loan, and (2) to buy out his partner in North 40. As noted above, the buy-out agreement between Mr. Thomas and DD also called for Mr. Thomas to receive some of the Pleasant Ridge lots. The initial plan was that DD was to retain three lots, Mr. Thomas was to receive ten lots, and Iberiabank was to receive thirty lots as collateral for the loan. By letter dated December 2, 1997, Ms. Chandler identified the particular lots that DD would retain and Mr. Thomas would receive.
Although DD's initial request, as reflected in Mr. Gilberts' memorandum and in his handwritten notes, indicated that only thirty lots would be pledged as collateral, both Jesuit Bend's loan application dated December 3, 1997 and Iberiabank's commitment letter dated December 9, 1997 state that the bank's collateral would be a first security interest on thirty-eight of the Pleasant Ridge lots. The description of the collateral on the first page of the loan application has the number thirty scratched out and the number thirty-eight handwritten in. The third page of the loan application, however, states that the appraised value of the thirty lots is *1165 $2,534,500 and that "eight still need values." The change in the collateral from the original thirty to thirty-eight lots was addressed extensively in Mr. Gilbert's depositions. The gist of Mr. Gilbert's testimony was that this change was the result of negotiations between DD and Mr. Thomas regarding the terms of the buyout agreement. However, there is no written documentation explaining this change. Nor was a copy of the buyout agreement ever produced.
On December 12, 1997, the Pleasant Ridge loan was closed. On that date, two interrelated transactions were executed. First, pursuant to an act of cash sale, North 40 transferred thirty-eight Pleasant Ridge lots to Jesuit Bend for a stated consideration of $1.3 million. Pursuant to a corporate resolution dated December 10, 1996, Kim Chandler signed the act of sale as North 40's agent. Second, Iberiabank loaned $1.3 million to Jesuit Bend as evidenced by a promissory note. That note was secured by a collateral mortgage note and collateral mortgage executed by Jesuit Bend, which encumbered the thirty-eight Pleasant Ridge lots it acquired from North 40 on that same date. The HUD settlement statement for the transaction reflects that the $1.3 million loan proceeds were disbursed to pay off the Whitney Bank's first mortgage balance of $1,051,390.02; the loan balance of $229,119.98 was paid to the borrower, Jesuit Bend. According to the loan commitment letter, $200,000 of the amount that Jesuit Bend received was earmarked to buy-out Mr. Thomas' interest in North 40. Neither Mr. Thomas nor his daughter attended the closing. Mr. Gilbert was present.
George Ruppenicker, the attorney for Southern Title, Inc., provided Iberiabank with an opinion letter, as required by the bank's commitment letter, stating that the collateral mortgage was properly executed in accord with the bank's commitment letter and that Jesuit Bend's execution of the loan documents was legally valid. According to Mr. Gilbert, that opinion letter established that the loan was closed pursuant to the bank's commitment letter and that the borrowing corporation was in good standing and authorized to do what it was doing. Mr. Gilbert, however, acknowledged that the loan was not closed pursuant to the commitment letter insofar as it relates to the $200,000 buyout of a partner.
Following the closing, Mr. Gilbert continued to request DD provide him with a copy of the buyout agreement between himself and Mr. Thomas. Mr. Gilbert explained that he wanted a copy of that agreement to ensure the bank's file contained all the proper documentation. However, as noted above, DD never provided the bank with a copy of the alleged agreement.
In late December 1997, Mr. Thomas called Mr. Gilbert to inquire about the Pleasant Ridge transaction. Mr. Gilbert informed Mr. Thomas that "he was to have received ... a check for $200,000, according to the agreement that I was told that he had with D.D. Sercovich, and that he would also have lots in the subdivision, that once they went to sale he would get the proceeds from." Mr. Gilbert further informed Mr. Thomas that he believed the number of lots he was to have received was five lots (i.e., the difference between 43 and 38 lots.) Mr. Thomas then informed Mr. Gilbert that he had not received the $200,000.
When Mr. Gilbert telephoned DD to find out why Mr. Thomas had not been paid, DD informed him that he was on his way to Mr. Thomas' house with the check. Mr. Gilbert requested DD provide him with a copy of the check as well as Mr. Thomas' acknowledgement of receipt of the check. Mr. Gilbert then called Mr. *1166 Thomas back and told him that DD would be bringing him a check. On January 26, 1998, Mr. Gilbert received a fax from DD, which contained a copy of the $200,000 check payable to Mr. Thomas dated December 15, 1997, as well as an acknowledgement of receipt purportedly signed by Mr. Thomas on January 26, 1998. Mr. Gilbert testified that he did not hear from Mr. Thomas again until after the Thomas Derivative Action was filed in December 1998.
On May 14, 1998, Mr. Gilbert received a fax from Iberiabank's VISA credit card department indicating that Jesuit Bend's (DD's corporate) VISA account was two months past due. This Iberiabank VISA card was issued in the name of Ms. Chandler and Jesuit Bend and had a delinquent balance of $19,014. The faxed statement reflected that significant charges had been made to the account at local gambling casinos. Mr. Gilbert testified that he was concerned about these charges. He further testified that he had no prior knowledge of any problems with this VISA account or of DD having a gambling problem. In investigating, Mr. Gilbert called DD to inquire why the VISA account was delinquent. DD informed him that it would be paid immediately. Mr. Gilbert also inquired if DD had a gambling problem. DD informed him that he did not have a gambling problem; rather, gambling was "one of his outlets."
On August 31, 1998, Mr. Gilbert received a call from an officer of Whitney Bank on behalf of Whitney's customer, Thigpen Construction, Inc. (Thigpen was the contractor on the Riverbend development.) Mr. Gilbert was informed that Thigpen's July 31, 1998 invoice of $270,000 had not been paid. Based on several conversations with Thigpen's president, Mr. Gilbert determined that Thigpen had not received any of the three checks Iberiabank had issued jointly to Thigpen and Jesuit Bend for the Riverbend project, which checks totaled about $450,000. On September 3, 1998, Mr. Gilbert and the bank's attorney met with DD regarding this problem. At that meeting, DD admitted to endorsing these checks, but falsely claimed that he had Thigpen's permission. On September 4, 1998, Thigpen filed a lien on the Riverbend property.
After discovering the problem with the Riverbend loan, Mr. Gilbert requested the bank's attorney perform a title check on all the Jesuit Bend properties in which Iberiabank had a security interest. According to Mr. Gilbert, this was done in preparation for a possible foreclosure proceeding on those properties.[3] In his December 30, 1998 memorandum to the Jesuit Bend Land Credit File, Mr. Gilbert noted that the bank's attorney had discovered four fraudulently executed partial releases, which had been executed to release several of the Pleasant Ridge lots from Iberiabank's collateral mortgage. On each of those partial releases, Mr. Gilbert's signature was forged. Mr. Gilbert testified that he believed it was DD who had executed these releases. DD's brother was the notary on each of those partial releases, and Ms. Chandler was a witness on two of them. Moreover, Mr. Gilbert explained that DD had pledged these fraudulently released Pleasant Ridge lots to several other banks as collateral for additional loans. One of those banks was Omni Bank.
On August 7, 1998, Omni Bank had loaned $400,000 to Jesuit Bend, taking as collateral seven of the fraudulently released *1167 Pleasant Ridge lots. This loan was apparently made to enable DD to pay off his $400,000 debt to GS  the debt DD's North 40 stock was pledged to secure. Although in opposition to the summary judgment GS introduced a handwritten document he obtained from Omni Bank during discovery and characterized this document as establishing that Mr. Gilbert discussed the Omni Bank loan with an Omni bank's loan officer before the loan was made, this document was not authenticated. Moreover, this document does not state who supplied the information to Omni Bank, and Mr. Gilbert denied ever having such a discussion with anyone at Omni Bank. Nonetheless, this handwritten document indicates that Omni Bank was informed that DD was a "good developer," that at that time there were "34 [Pleasant Ridge lots] out of 82," and that Omni was to receive as collateral for its loan seven of those lots.
In September 1998, in an effort to assist his financially troubled brother and to recoup the $400,000 he had loaned to DD, GS decided to take over the Riverbend Project, which was also funded by Iberiabank. In making that decision, GS retained a tax attorney, Francis J. Lobrano, and arranged a meeting with Mr. Gilbert, who also handled the Riverbend loan. As noted in Mr. Gilbert's e-mail, GS "wanted to get as many facts regarding the [Riverbend] project before he met with DD." In an effort to do so, GS provided Iberiabank with a release prepared by Mr. Lobrano and executed by DD authorizing the bank to provide him with complete information regarding DD, North 40, and Jesuit Bend. Mr. Gilbert acknowledged receiving this release, but testified that he turned it over to the bank's credit department and that he had no control over the matter.
On September 18, 1998, Mr. Gilbert met with GS and Mr. Lobrano. The record reflects that there are two divergent versions of what was discussed at this meeting. In his September 24, 1998 memorandum to the Board Loan Committee, Mr. Gilbert stated that "Gary [GS] admitted at this meeting that he was considering taking over the Riverbend Place project. His reason was to determine if he could recoup $400,000 he lent D.D. several months earlier." This memorandum further states that "[o]n 9/21/98, Gary and D.D. agreed to the transfer of Riverbend Place to Gary's control for the balance of the promissory note and the cost of removing Thigpen's lien." This memorandum still further states that GS told Mr. Gilbert that his brother has a gambling problem, which has been compounded by the opening of the Harvey casino and by his "ability to manipulate payments on his projects."
In the e-mail he wrote on the day of the meeting, Mr. Gilbert also memorialized his version of that meeting as follows:
Gary [GS] told me that DD owes him $400,000 and he has been pressing DD for payment. After several discussions, he has determined that all of DD's assets are pledged. Gary said that DD has a gambling problem that has gotten worse in the past year. DD had been able to juggle the sale of properties and financing of other projects to support his habit. DD recently borrowed $400,000 from the Omni Bank to pay Gary. Instead, the money went to gambling and Gary suspects that DD has set aside cash for himself. Maybe as much as $100-$200 thousand.
In their affidavits that were filed in opposition to Iberiabank's motion for summary judgment, GS and Mr. Lobrano provided their starkly different version of the meeting. They attested that they did not inform Mr. Gilbert that GS had determined that all of DD's assets are pledged; *1168 that they neither knew nor discussed at the meeting the $400,000 Omni loan; that no such "juggling" of properties was either known to them or discussed at the meeting; and that GS did not tell Mr. Gilbert that his brother, DD, had a gambling problem. They further attested that Mr. Gilbert failed to disclose to them that North 40 was not even an Iberiabank customer, that North 40 had transferred substantially all of its assets to Jesuit Bend, that DD was charging substantial gambling debts to his Iberiabank corporate VISA card, and that Jesuit Bend was already in default on its loans with Iberiabank and that his take over of the Riverbend loan would not be sufficient to cure this default.

PROCEDURAL BACKGROUND
On December 11, 1998, Mr. Thomas and his daughter, Ms. Routzahn, commenced the Thomas Derivative Action. Named as defendants were DD, as a North 40 officer and shareholder; Ms. Chandler, as a North 40 officer; and Jesuit Bend, DD's wholly owned corporation. They alleged that North 40, through its two officers (DD and Ms. Chandler), transferred the Pleasant Ridge lots to Jesuit Bend without either adequate consideration and without proper corporate authority. They characterized this transfer as fraudulent and an unlawful plan, scheme, or conspiracy to convert and misappropriate substantially all of North 40's property. They alleged DD breached his fiduciary duty to North 40 and engaged in self-dealing. They prayed to rescind the transfer of the Pleasant Ridge lots to the extent the lots had not been sold by Jesuit Bend to third parties, and, as to those lots that had been sold, they prayed for damages. On July 13, 1999, Mr. Thomas and Ms. Routzhan filed a supplemental and amending petition naming additional defendants, including the closing notary, title company, and title attorney.
On July 20, 1999, Old Republic National Title Insurance Co., which issued a title insurance policy on the Pleasant Ridge loan to Iberiabank, entered into a settlement agreement with the three North 40 shareholders. Although a copy of that agreement is not in the record, the pleadings indicate it included: (i) a cash payment to Mr. Thomas and Ms. Routzahn of $382,500; (ii) a warranty by Mr. Thomas, Ms. Routzhan, and DD that they were North 40's only shareholders; and (iii) a transfer of the Pleasant Ridge lots still owned by Jesuit Bend to Iberia Jesuit, a corporation controlled by Iberiabank and created for the purpose of acquiring these lots from Jesuit Bend for subsequent resale. As a result of that settlement, on July 20, 1999, the trial court signed an order of partial dismissal of the claims asserted in the Thomas Derivative Action. The three of the North 40 shareholders signed the order of partial dismissal.[4]
On December 7, 1999, GS filed an intervention in the Thomas Derivative Action as either a pledgee or an owner of DD's 250 shares of North 40 stock (i.e., DD's 50% interest). GS alleged that DD defaulted on the $400,000 debt that DD's stock was pledged to secure and that he therefore was the owner of the collateral (i.e., the *1169 pledged stock) by virtue of the terms of the stock pledge agreement. GS further alleged that the July 1999 settlement resulted in the unlawful distribution of North 40's corporate property to Mr. Thomas and Ms. Routzahn. On July 12, 2000, GS filed an amended intervention petition adding the Iberiabank Defendants and alleging the settlement unlawfully transferred North 40's property to Iberia Jesuit. GS sought a judgment recognizing his ownership of DD's 250 shares of North 40 stock, his right to proceed derivatively on North 40's behalf, an order compelling Mr. Thomas and Ms. Routzahn to account for and return all North 40's property, and to nullify for lack of cause and consideration all the property transfers confected as part of the July 1999 settlement. In response, the Iberiabank Defendants filed an exception of no right of action. The trial court denied that exception, reasoning that "a pledgee of stock has the same right to protect his shareholder's equity as does the pledgor, even if the stock has not been registered in his name on the books of the corporation." The court further noted that there were issues with the manner in which the July 1999 settlement was perfected. This court denied the Iberiabank Defendants' writ application from that ruling.
On December 6, 2001, GS filed a second supplemental and amended petition of intervention, asserting two additional claims against the Iberiabank Defendants: (1) conspiracy in the fraudulent transfer of North 40's property to Jesuit Bend, and (2) racketeering in violation of the Louisiana Racketeering and Corrupt Practices Act, La. R.S. 15:1351-56. The Iberiabank Defendants filed an exception of vagueness and ambiguity based on La. C.C.P. art. 856, which requires that fraud be pled with particularity. On March 11, 2002, the trial court sustained those exceptions and ordered GS to amend his petition to state with particularity each instance of fraud or illegal conduct alleged to have been conducted by the Iberiabank Defendants. On March 22, 2002, GS filed a third supplemental and amended petition of intervention. In this amended intervention, GS asserted the following pertinent allegations regarding Iberiabank's knowledge:
 Iberiabank loaned the monies to Jesuit Bend, which enabled it to commit the theft of the thirty-eight lots from North 40 and had actual knowledge of the fact that North 40 was being stripped of substantially all of its assets.
 Iberiabank had actual knowledge that there was another shareholder of North 40, which corporation was being stripped of substantially all of its assets as a result of its loan for no consideration whatsoever.
 Iberiabank had actual knowledge that no funds were being distributed to North 40 and that even the $200,000 of the loan proceeds that were committed to be used to "pay partners" were diverted, and it concurred in and authorized the diversion of the funds when the loan was funded.
 Iberiabank knew or should have known as a result of the appraisals of the property in question and the amount and nature of the loan being made by it and its analysis of the loan-to-value ratios of the mortgage transaction it was making, that this real estate transaction entailed a sale and mortgage of substantially all of the corporate assets of North 40, a corporation owned by multiple shareholders, to another corporation owned solely by DD, a director and officer of North 40.
 Iberiabank knew that the immovable property being sold to Jesuit Bend for $1.3 million was actually worth $2.75 million by its review of appraisals of the *1170 property and analysis of loan to value ratios and the mortgage it was taking as security.
 All the loan proceeds were distributed to Jesuit Bend and North 40 received nothing from the sale of all of its assets, facts known to Iberiabank in that it specifically authorized and directed that the transaction be concluded in that manner and which provided the funding for the same against closing statements reflecting the precise disbursement of its funds and in accordance with its commitment letter reflecting that no consideration was ever intended to be paid to North 40 by the transaction.
GS alleges that Iberiabank's actual knowledge of the precise details of the transaction arose based on the following: (a) through its review of North 40's and Jesuit Bend's financial statements and other documents submitted to it in the loan application process; (b) through its review of the public records of the parish reflecting the immovable property owned by North 40 and the property that was being mortgaged to it in the transaction; (c) as a result of Ms. Chandler's and DD's statements made to it and its loan commitment and closing instructions that required payment of funds to the other North 40 shareholders; (d) as a result of its approval of changes in the closing instructions in such manner that the other North 40 shareholders received nothing; (e) as a result of its approval and funding of a transaction whereby substantially all of North 40's property was removed from North 40 and transferred to another corporation for no consideration whatsoever; and (f) in such other manner as may become apparent through discovery.
On July 12, 2002, the Iberiabank Defendants filed exceptions of vagueness and no cause of action and a motion for partial summary judgment on the conspiracy to commit fraud and racketeering claims asserted in the amended intervention.
On November 6, 2002, the trial court rendered judgment in favor of GS, denying the exceptions as well as the motion for partial summary judgment. In its reasons for judgment, the court noted that it was presented with a peculiar procedural problem in that the movers (the Iberiabank Defendants) had failed to support their summary judgment motion with any evidence; whereas, the opponent (GS) had supported his opposition with the deposition testimony of Mr. Gilbert, the bank officer who handled this transaction. Based on its review of the evidence GS submitted, the trial court concluded that there was no basis upon which to find fraud or racketeering by the Iberiabank Defendants. Rather, the court found that "[a]t best, Iberia[bank] was negligent in not assuring that loan proceeds were distributed as intended at the time of the loan closing." Although the trial court expressed its belief that the fraud and racketeering claims should be dismissed, the court found it could not do so given the peculiar procedural posture of the case. As the court put it, "[w]hile in this case it appears that Sercovich [GS] has negated the basis for his own claim, nevertheless, Iberia[bank Defendants] has [sic] submitted nothing in support of their motion and it will be dismissed."
On December 23, 2002, the Iberiabank Defendants re-filed their motion for summary judgment with supporting evidence, including Mr. Gilbert's deposition testimony. Granting summary judgment, the trial court provided the following written reasons for judgment:
[T]he Court is left with no basis upon which to find fraud or acts of racketeering on the part of Iberia. At best, Iberia was negligent in not assuring that loan proceeds were distributed as intended *1171 at the time of the loan closing. These acts of alleged negligence simply do no[t] lend themselves to the causes sought to be dismissed by this motion.
For instance, Gerald Gilbert, a loan officer of Iberia who was responsible for the loan and mortgage which led to Darold's nefarious activity, was questioned at length about his involvement. He testified that he received the request from Darold for a loan of approximately $1.3 million to pay off an existing mortgage and to buy out Darold's partner in North 40 for $200,000 plus 7 lots in Pleasant Ridge Estates (the property to be mortgaged as security for the loan).
Gilbert had the property appraised and the estimated value of $2.5 million was more than sufficient as collateral for the loan. Additionally, since Darold was 75% owner of North 40 and Thomas only a 25% owner, Gilbert had no reason to believe that $200,000 and seven lots was insufficient consideration for the buy-out. In fact, the loan application and documents were later changed to indicate the transfer of 10 lots instead of 7 which Gilbert believed to be the result of negotiations between Sercovich and Thomas.
It was only some time after the closing did Gilbert find out that Thomas was not paid when he received a call from Thomas with that complaint. Gilbert testified that he called Sercovich to check on the issue and was told by him that Thomas had been paid. In fact, Iberia has in their file a check to Thomas for $200,000 with a signature, obviously forged, showing that it was received by Thomas.
Although the trial court acknowledged that circumstantial evidence may be sufficient to defeat summary judgment and that Mr. Gilbert's actions might be construed as "at least circumstantial evidence of his knowledge of Darold's improper actions," the court concluded that "the evidence does not rise to that level, even if it can be viewed as evidence at all."
Although on August 21, 2003, the trial court rendered judgment dismissing all GS' claims against the Iberiabank Defendants and declaring it to be a final judgment, the trial court on November 24, 2003, granted GS' motion for new trial to clarify that only GS' claims asserted in his Second and Third Amending Intervention Petition (i.e., his conspiracy to commit fraud and racketeering claims) were dismissed. The trial court included in its judgment a declaration designating it as a partial final judgment pursuant to La. C.C.P. art. 1915(B)(1). From that judgment, GS appeals.

PARTIAL FINAL JUDGMENT
GS first argues that the trial court erred in designating the judgment dismissing his conspiracy to commit fraud and racketeering claims as final pursuant to La. C.C.P. art. 1915(B)(1) because the court failed to state clear and concise reasons why there is no just reason for delay. As noted above, the trial court cited in the judgment the pertinent procedural provision authorizing the partial final judgment in this case, La. C.C.P. art. 1915(B)(1), and included in the judgment an express articulation that there is "no just reason for delay in entering this judgment as a final judgment." However, as GS emphasizes, the trial court did not expressly state the reasons it designated the judgment as final.
In Ahner v. Hatfield, XXXX-XXXX (La.App. 4 Cir. 12/30/03), 865 So.2d 205, we held that "[t]he mere use of the cursory language `there is no just reason for delay' is insufficient to meet the requirements of La. C.C.P. art. 1915(B)(1)." Hatfield, XXXX-XXXX at p. 3, 865 So.2d at 207 (citing Motorola, Inc. v. Associated Indem. Corp., *1172 XXXX-XXXX, p. 1 (La.App. 1 Cir. 10/22/03), 867 So.2d 723, 739)(Kuhn, J., dissenting)). However, we recently held that our review of Article 1915(B) certifications must be done "on a case by case basis taking into consideration the totality of what was intended and whether in context conclusory statements equate to adequate reasons." LHO New Orleans LM, L.P. v. MHI Leasco New Orleans, Inc., XXXX-XXXX, XXXX-XXXX, p. 7 (La.App. 4 Cir. 3/3/04), 869 So.2d 304, 308; see also Montgomery v. Lobman, Carnahan, Batt & Angelle, 98-2098, pp. 2-3 (La.App. 4 Cir. 2/17/99), 729 So.2d 1075, 1076 (finding a trial judge's adding the notation "it's appealable" to judgment granting a partial summary judgment sufficient to designate judgment as final and thus appealable).
A review of the finality certification in this case in the context in which it was made establishes that the trial court's arguably conclusory statements in the judgment that there is no just reason for delay equate to adequate reasons. As the parties acknowledge, the trial court judge expressed concerns at the summary judgment hearing regarding the impact of a recent decision by this court in Wood v. Becnel, XXXX-XXXX (La.App. 4 Cir. 2/26/03), 840 So.2d 1225, on his decision in this case. In Wood, this court reversed another summary judgment decision by the same trial court judge. In so doing, we found that the trial court had improperly granted summary judgment because the circumstantial evidence presented in that case was sufficient to create a genuine issue of material fact. Voicing concern about the impact of Wood on his decision in this case, the trial court judge stated in his written reasons for judgment that Mr. Gilbert's actions might be construed as "at least circumstantial evidence of his knowledge of Darold's [DD's] improper actions," yet concluded that "the evidence does not rise to that level, even if it can be viewed as evidence at all." Given these concerns, we conclude that the statutory requirement that the trial court make an express determination that there was no just reason for delay was complied with in this case.
GS next argues that the trial court's decision to designate the judgment as final was inappropriate because discovery had not been completed. The Iberiabank Defendants counter that the judgment was properly certified because the dismissal of GS' conspiracy and racketeering claims with finality shortened the time needed to try this case. GS replies that the only thing that was shortened was its right to discovery. The jurisprudence has articulated several, non-exclusive factors that courts should consider in determining whether a partial judgment has been properly certified as final. Banks v. State Farm Ins. Co., 30,868, p. 4 (La.App.2d Cir.3/5/98), 708 So.2d 523, 525. Although the shortening of the trial is one of those factors, the completion of discovery is not one. Regardless, as discussed elsewhere in this opinion, adequate discovery was conducted in this case before the trial court granted summary judgment. Under the circumstances presented in this case, we cannot say that the trial court erred in designating this judgment an appealable partial final judgment under La. C.C.P. art. 1915(B)(1).

SUMMARY JUDGMENT
GS contends that the trial court erred in granting summary judgment dismissing its conspiracy to commit fraud and racketeering claims because there are genuine issues of material fact as to those claims. The Iberiabank Defendants counter that summary judgment was properly granted. We agree.
"Favored in Louisiana, the summary judgment procedure `is designed to secure *1173 the just, speedy, and inexpensive determination of every action' and shall be construed to accomplish these ends." King v. Parish National Bank, XXXX-XXXX, p. 7 (La.10/19/04), 885 So.2d 540, 545 (quoting La. C.C.P. art. 966(A)(2)). Appellate courts review grants of summary judgment de novo using the same standard applied by the trial court in deciding the motion for summary judgment. Schmidt v. Chevez, 2000-2456, p. 4 (La.App. 4 Cir.1/10/01), 778 So.2d 668, 670. According to this standard, a summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Schmidt, 2000-2456 at p. 3, 778 So.2d at 670.
The party seeking the summary judgment has the burden of affirmatively showing the absence of a genuine issue of material fact. Allen v. Integrated Health Services, Inc., 32,196, p. 3 (La.App. 2 Cir. 9/22/99), 743 So.2d 804, 806. A fact is "material" if its existence or nonexistence may be essential to the plaintiff's cause of action under the applicable theory of recovery. Schmidt, 2000-2456 at p. 3, 778 So.2d at 670 (citing Moyles v. Cruz, 96-0307 (La.App. 4 Cir. 10/16/96), 682 So.2d 326). Simply stated, a "material" fact is "one that would matter on the trial on the merits." Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751.
Since the movants, the Iberiabank Defendants, will not bear the burden of proof at trial, it is not necessary that they negate all elements of GS' claims. Rather, they need only point out to the court the absence of factual support for one or more elements essential to GS' claims. Once the movants meet this initial burden, the burden shifts to GS to present factual support sufficient to establish his ability to satisfy the evidentiary burden at trial. If GS then fails to satisfy this burden, there is no genuine issue of material fact and the movers are entitled to summary judgment. King, XXXX-XXXX at p. 8, 885 So.2d at 545-46. The opponent to a properly supported motion for summary judgment may not rest on the mere allegations or denials of his or her pleadings, but must respond by affidavits or as otherwise provided by law setting forth specific facts showing that there exists a genuine issue of material fact for trial. Coates v. Anco Insulations, Inc., XXXX-XXXX, p. 5 (La.App. 4 Cir. 3/21/01), 786 So.2d 749, 753.
"`Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor.'" Wood, XXXX-XXXX at p. 7, 840 So.2d at 1228 (quoting Knowles v. McCright's Pharmacy, Inc., 34,559, p. 3 (La.App.2d Cir.4/4/01), 785 So.2d 101, 103). Stated otherwise, any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Barbarin v. Dudley, XXXX-XXXX, p. 6 (La.App. 4 Cir. 12/20/00), 775 So.2d 657, 660 (citing Azreme, Corp. v. Esquire Title Corp., 98-1179 (La.App. 5 Cir. 3/30/99), 731 So.2d 422). Only when reasonable minds must inevitably conclude that the mover is entitled to summary judgment as a matter of law on the facts before the court is a summary judgment awarded. Allen, 32,196 at p. 3, 743 So.2d at 806.
We acknowledge, as GS contends, that circumstantial evidence may be used to defeat summary judgment and that summary judgment is rarely appropriate to determine subjective factual issues *1174 such as intent, motive, or knowledge. However, the general rule that summary judgment is inappropriate in cases involving state of mind issues is only applicable "`where solid circumstantial evidence exists to prove plaintiff's case.'" Carter v. BRMAP, 591 So.2d 1184, 1190 (La.App. 1 Cir.1991)(quoting Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 711 (2nd Cir.1991)); BRMAP, 591 So.2d at 1189 (noting that the jurisprudence has recognized that summary judgment may be appropriate "when there is no issue of material fact concerning the pertinent intent.") "`Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" BRMAP, 591 So.2d at 1190 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)).
As noted, the determination of whether a fact is material hinges on the applicable theory of recovery. In this case, the two theories of recovery at issue are conspiracy to commit fraud under La. C.C. art. 2324 and racketeering under La. R.S. 15:1351-56.
Under La. C.C. article 2324, "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. C.C. art. 2324(A). To establish a conspiracy, a plaintiff is required to provide evidence of the requisite agreement between the parties. Guidry v. Bank of LaPlace, 94-1758, p. 9 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052, 1058. Stated otherwise, the plaintiff is required to establish a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing. Id.
The conspiracy action is "for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts." Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553, 557 (5th Cir.1995). Proof of a conspiracy can be by "actual knowledge of both parties or overt actions with another, or can be inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." Stephens v. Bail Enforcement of Louisiana, 96-0809, p. 10 (La.App. 1 Cir. 2/14/97), 690 So.2d 124, 131. "The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. The assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy." Chrysler Credit, 51 F.3d at 557. Absent a conspiracy, Louisiana law does not recognize a distinct cause of action for aiding and abetting. Guidry, 94-1758 at p. 8, 661 So.2d at 1057.
The actionable element of a conspiracy claim is not the conspiracy itself; rather, it is the tort that the conspirators agree to perpetrate and actually commit in whole or in part. Ross v. Conoco, Inc., XXXX-XXXX, pp. 7-8 (La.10/15/02), 828 So.2d 546, 552 (citing Butz v. Lynch, 97-2166, p. 6 (La.App. 1 Cir. 4/8/98), 710 So.2d 1171, 1174). Simply stated, the unlawful act is the tortious conduct. Chrysler Credit, 51 F.3d at 557. In this case, the alleged unlawful act is fraud.
The obligations articles of the Civil Code define fraud to mean: "a misrepresentation or suppression of the truth made with the intention either to obtain either an unjust advantage for one party or to cause a loss or inconvenience to the other party. *1175 Fraud may also result from silence or inaction." La. C.C. art. 1953. Those articles also provide that "[f]raud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." La. C.C. art. 1957.
"Not all fraud actions are contract claims." Boudreaux v. Jeff, XXXX-XXXX, p. 10 (La.App. 1 Cir. 9/17/04), 884 So.2d 665, 672. Fraud actions may also constitute a tort, sometimes called deceit. Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 2-6(j)(1996). A party injured by the fraud or deceit of another may have two causes of action, a contract and a tort action, and may elect to recover his damages in either of those actions. Bunge Corp. v. GATX Corp., 557 So.2d 1376, 1385 (La.1990). When fraud is alleged, "all persons who participated in the alleged fraud and those who are beneficiaries are proper parties to the suit." Id. (citing La. C.C. art. 2324 and Dohm v. O'Keefe, 458 So.2d 964, 965 (La.App. 4th Cir.1984), Pittman v. Piper, 542 So.2d 700, 702 (La.App. 4th Cir.1989)).
The second theory at issue is racketeering under La. R.S. 15:1351-56. Although these statutes are part of the Code of Criminal Procedure, they provide for a civil cause of action similar to the federal RICO statute. As initially enacted, this Chapter was entitled "Drug Racketeering and Related Organizations" and encompassed only "drug related" activity. In 1992, however, the Legislature amended these statutes. As part of that amendment, the Legislature deleted the word "drug" from the title of this Chapter; as a result, this Chapter is now entitled the "Louisiana Racketeering Act." The amendment also changed the defined term from "drug racketeering activity" to "racketeering activity." La. R.S. 15:1352(A). However, the Legislature did not amend La. R.S. 15:1356, the civil remedies provision of the statute; as a result, Section 1356 now provides:
Any person who is injured by reason of any violation of the provisions of R.S. 15:1353 shall have a cause of action against any person engaged in a drug racketeering activity who violates a provision of R.S. 15:1353. Such injured person shall be entitled to recover three times the actual damages sustained or ten thousand dollars, whichever is greater. Such person shall also recover attorneys' fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.
La. R.S. 15:1356 (Emphasis supplied). The remedies statute, on its face, is thus limited to "drug racketeering activity."
Addressing this statutory construction issue, the trial court, in denying the Iberiabank Defendants' exception of no cause of action, found that the remedies statute "allows a cause of action for non-drug activities as are alleged in the petition." Because we find GS failed to establish fraud or any other criminal conduct on the part of the Iberiabank Defendants as required to state a racketeering claim, we need not resolve this statutory construction issue in this case. Nonetheless, we note that this appears to be an issue the Legislature should address. If the Legislature intended to extend the civil remedies provision to non-drug activities, it should amend this statute to delete the word "drug."
Both GS' conspiracy to commit fraud and racketeering claim are based on the allegation that the Iberiabank Defendants acted in concert with DD in his fraudulent scheme of transferring North 40's assets to Jesuit Bend without any consideration. As the Iberiabank Defendants concede, the obvious fraud in this case was DD's transfer of the Pleasant Ridge lots from North 40 to Jesuit Bend *1176 without informing the other North 40 shareholders.
In his amended intervention, GS alleges that the Iberiabank Defendants' actions aided and abetted the execution and confection of DD's fraudulent scheme by:
 Causing and permitting Jesuit Bend to strip North 40 of substantially all of its assets without any consideration.
 Distributing funds intended for the "buy out" of North 40's partners to Jesuit Bend and DD.
 Failing to ascertain in making the loan and stripping North 40 of substantially all of its assets that the transaction was properly authorized under Louisiana law and that the execution of the sale documents did not violate any laws to which Jesuit Bend is subject, and that there was no conflict or breach of any agreement to which Jesuit Bend was a party.
 Making a loan involving fraudulent conduct and self-dealing between DD and his solely owned corporation, Jesuit Bend, and North 40, of which DD is an officer and director, with knowledge that there existed another partner in North 40 whose corporation was being stripped of substantially all of its assets without consideration.
 Failing to detect, and active participation in, the fraudulent scheme being perpetuated by DD to commit theft of the corporate assets of North 40 to his own personal use and aiding and abetting the said scheme and transaction by providing the funds to him for such purpose.
In support of his conspiracy and racketeering claims, GS cites Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553, 557 (5th Cir.1995).[5] In that case, a conspiracy was found to exist between the Whitney Bank ("Whitney") and its customer, Toyota of Jefferson ("TOJ"), to defraud Chrysler Credit, a car-inventory floor plan financer. In affirming the jury's finding of a conspiracy, the court relied heavily on the stipulated fact that Whitney had actual knowledge of Chrysler Credit's security interest in the car sale proceeds. "That knowledge, combined with Whitney's actions to setoff the car sale proceeds to the detriment of the normal floor plan financing procedure, and Whitney's support of TOJ's varied expenditures provided an ample basis for a reasonable juror to infer an underlying agreement between Whitney and [its customers] to convert Chrysler Credit's funds." Chrysler Credit, 51 F.3d at 561. Continuing, the court found a conspiracy was formed between Whitney and TOJ that allowed TOJ to effectively use the proceeds from the car sales for purposes other than to pay Chrysler Credit, which involved TOJ, with Whitney's full knowledge, utilizing the car sale proceeds to pay for various expenses of TOJ. Id.
By analogy, GS contends that a conspiracy was formed among DD, Jesuit Bend, and Iberiabank to use North 40's property for purposes other than North 40's benefit. GS further contends that the conspiracy to convert North 40's property involved DD and Jesuit Bend, with Iberiabank's full knowledge, stripping North 40 of its assets to pay for the expenses of DD and Jesuit Bend, and Iberiabank earning money on both the new mortgage and its existing mortgages on the property of DD and Jesuit Bend.
GS' reliance on Chrysler Credit is misplaced, factually and legally. Legally, Chrysler Credit is distinguishable in that it involved a dealer floor-plan arrangement, which is an inherently fiduciary bank-customer *1177 relationship. See Edward B. Kramer, Comment, Louisiana Lender Liability, 50 La. L.Rev. 143, 145, n. 19 (1989)(noting that "[s]ome bank/customer relationships are inherently fiduciary in nature" and citing as an example a "dealer floor-plan loan for a borrower involved in selling automobiles"). Chrysler Credit also involved a bank (Whitney) that took an active role in its customer's (TOJ's) daily business affairs. In contrast, contrary to GS' contention, this case involves an ordinary bank-customer relationship between Iberiabank and Jesuit Bend.
Factually, Chrysler Credit is distinguishable from this case in that, as noted above, it was stipulated that Whitney had actual knowledge of Chrysler Credit's security interest. In this case, no such actual knowledge on the part of Iberiabank of DD's fraudulent scheme at the time it made the Pleasant Ridge loan was established. Although GS contends that Iberiabank had certain knowledge that it was funding Jesuit Bend's theft of North 40's property (i.e., the approximately $2 million in equity in the Pleasant Ridge lots), GS failed to produce evidence, direct or circumstantial, to support that contention.
GS contends that the stated purpose of the Pleasant Ridge loan was an "obvious sham" as the Pleasant Ridge development could have been refinanced and the partner (Mr. Thomas) could have been bought out by Iberiabank funding the loan to North 40. However, no factual support is given for this contention.
GS further contends that the lack of any documentation in the bank records regarding the reason for the change in the number of lots offered as collateral should form the basis of a negative inference. We disagree. Mr. Gilbert explained this change as resulting from negotiations between DD and Mr. Thomas regarding the buyout agreement. GS suggests a link between the fraudulent releases of the lots and the change in the number of lots pledged as collateral; however, he offers no proof for this suggestion.
GS still further contends that the conspiracy was furthered by Mr. Gilbert's subsequent "lying and deceitful conduct" in dealing with GS in connection with his taking over the Riverbend Project. GS notes that Iberiabank acknowledged that it learned of DD's questionable transactions nine months after the Pleasant Ridge loan was made, yet, despite his written request for such information, Iberiabank failed to inform him. He cites the affidavits of himself and Mr. Lobrano attesting to Iberiabank's failure to disclose such information. Although GS alleges that Iberiabank had "assumed a duty to provide the information requested," he cites no authority or basis for this allegation.[6]
Although the record could support an inference of negligence,[7] a conspiracy claim *1178 requires proof of more than negligence; it requires either "intentional or willful" conduct. La. C.C. art. 2324. This "arguably means something less than intent, but more than negligence." Louisiana Tort Law, supra at § 2-5. GS' conspiracy claim is premised on fraud. However, GS failed to provide proof of fraud on the part of the Iberiabank Defendants. Nor, as noted above, did GS provide proof of any other criminal conduct on the part of the Iberiabank Defendants as required to state a racketeering claim.
Summarizing, we find the Iberiabank Defendants supported their motion for summary judgment with Mr. Gilbert's testimony and other evidence establishing a normal bank-customer relationship between the bank and Jesuit Bend and the lack of actual knowledge on the part of the bank of DD's fraudulent scheme at the time the Pleasant Ridge loan was made. The burden thus shifted to GS to produce evidence to the contrary. GS failed to satisfy that burden. Accordingly, the trial court did not err in determining that no genuine issue of material fact exists as to the conspiracy to commit fraud and racketeering claims.
GS also contends, as he did at the trial court level, that summary judgment was prematurely granted because discovery is incomplete. In support, GS cites La. C.C.P. art. 966 C(1)'s requirement that a summary judgment should only be considered "[a]fter adequate discovery" and La. C.C.P. art. 966(B)'s provision that the trial court "shall give the adverse party additional time to file a response, including opposing affidavits or depositions." GS also enumerates the following five items of specific discovery that needed to be completed:
1. Mr. Thomas and Ms. Routzhan have refused to provide requested subpoenaed documents concerning their role in this matter, including such basic documents as their corporate records of North 40.
2. The return of records by Iberiabank on subpoena duces tecum was clearly insufficient and did not include all of the bank's records. Records were missing for specific periods of time when it is obvious records existed.
3. Although the deposition of Mr. Gilbert has been completed, it requires the taking of certain further depositions, including depositions of officers and employees of Omni Bank and Whitney Bank.
4. DD was in jail at the time of the summary judgment and needs to be deposed.
5. Returns on subpoenas to Whitney bank have not been produced at the time of the hearing.[8]
Countering, the Iberiabank Defendants cite the protracted procedural history of this case as establishing that the summary judgment was not premature. They note that GS' intervention was filed on December 7, 1999. The Iberiabank Defendants were joined by an amended intervention on July 12, 2000. The second supplemental intervention, which added the fraud and racketeering counts, was filed on December *1179 12, 2001. After the trial court sustained the vagueness exception, GS filed the third supplemental intervention on March 22, 2002. The Iberiabank Defendants filed their first summary judgment motion on June 12, 2002. The trial court denied that motion on November 6, 2002. The Iberiabank Defendants filed their second summary judgment motion on December 23, 2002. They stress that this was eighteen months after they were first joined as defendants and that GS did not seek discovery until after the second summary judgment was filed. They also stress that on GS' motion, the trial court continued the summary judgment motion, which was initially set for April 1, 2003, until May 6, 2003.
The Iberiabank Defendants further argue that there was a five month interval between the filing of their second motion for summary judgment and the hearing thereon. During that interval, GS conducted substantial discovery. Mr. Gilbert's deposition was taken for two days, and a large volume of documents were produced by Iberiabank. Under these circumstances, the Iberiabank Defendants contend that adequate discovery was allowed and that CS was given a fair opportunity to present its case. We agree.
The jurisprudence holds that the requirement is that summary judgment shall not be considered until adequate discovery is conducted; the requirement is not that discovery be completed. Stated otherwise, "our jurisprudence holds that while parties must be given fair opportunity to carry out discovery and present their claim, there is no absolute right to delay action on motion for summary judgment until discovery is complete." Butzman v. Louisiana Power and Light Co., 96-2073, p. 4 (La.App. 4 Cir. 4/30/97), 694 So.2d 514, 517. As the Louisiana Supreme Court has held:
The only requirement is that the parties be given a fair opportunity to present their claim. Unless plaintiff shows a probable injustice a suit should not be delayed pending discovery when it appears at an early stage that there is no genuine issue of fact.
Simoneaux v. E.I. du Pont de Nemours and Co., 483 So.2d 908, 912-13 (La.1986).
Applying these precepts here, we find no evidence showing that the Iberiabank Defendants failed to comply with ordered discovery requests or that relevant discovery is incomplete. The record reflects that Iberiabank produced thousands of pages of documents and that its officer, Mr. Gilbert, was deposed for three days. As to the other items, GS has failed to articulate how further discovery from other banks will result in relevant facts to defend against the Iberiabank Defendants' summary judgment motion. As to the fact that DD's deposition has not been taken, GS has not articulated any attempts it has made to take that deposition during the lengthy period this case has been pending. We thus find the trial court did not prematurely grant summary judgment.

DECREE
For the foregoing reasons, the judgment of the trial court granting Iberiabank's and Iberia Jesuit's partial motion for summary judgment is affirmed.
AFFIRMED.
NOTES
[1] Although the Riverbend loan is not directly at issue in this case, it is relevant insofar as it establishes the ongoing lending relationship between DD, as owner of Jesuit Bend, and Iberiabank.
[2] The correct ownership interests in North 40 at all times have been DD, 50%; Mr. Thomas, 25%; and Ms. Routzahn, 25%. However, DD misrepresented to Iberiabank in connection with the Pleasant Ridge loan that he owned 75% of North 40. According to Mr. Gilbert, he was unaware of this misrepresentation until after the Thomas Derivative Action was filed.
[3] As discussed elsewhere, title to the remaining Pleasant Ridge lots ultimately was transferred to Iberia Jesuit in connection with the July 1999 settlement agreement.
[4] The dismissal provided in pertinent part that: (i) all claims to rescind sales of lots are dismissed with prejudice; (ii) all claims to declare void sales of lots are dismissed with prejudice; (iii) all claims alleging sales of lots to be lesionary are dismissed with prejudice; (iv) plaintiffs' right to proceed on in personam causes of action against Jesuit Bend, DD, and Ms. Chandler is reserved.; and (v) plaintiffs are forever precluded from attacking or claiming any defect in any mortgage or transfer of any property in Pleasant Ridge by Jesuit Bend, or DD, or Ms. Chandler, or North 40.
[5] Contrary to GS' contention, Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553, 557 (5th Cir.1995) did not involve a racketeering claim.
[6] We note that La. R.S. 6:1124, which Iberiabank cites, provides that a financial institution has no fiduciary relationship to its customers or third persons absent a written agreement under which it specifically agrees to act in a fiduciary capacity.
[7] We recognize that the record contains some evidence from which negligence on the part of Iberiabank could be inferred. First, as the trial court noted, Iberiabank's failure to ensure that the $200,000 was paid to Mr. Thomas at the closing could form the basis of an inference of negligence. Second, Iberiabank's failure to review carefully North 40's financial statements, which the bank obtained in April 1997 in connection with an application by North 40 for a loan that was never processed, could form the basis of an inference of negligence. Those financial statements reflected the identity of North 40's three shareholders and the fact that DD only owned 50% of the stock. However, in connection with the Pleasant Ridge loan, DD represented to Mr. Gilbert both orally and in his own financial statements that he owned 75% of the stock in North 40 and that Mr. Thomas owned the other 25%. Mr. Gilbert testified that he did not learn until the Thomas Derivative Action was filed that DD's representation that he owned 75% of North 40 was incorrect and that there was a third shareholder of North 40, Ms. Routzhan.
[8] Similarly, at oral argument before this court, counsel for GS enumerated the discovery that needed to be completed including: (i) taking Omni Bank's officer's deposition, (ii) the return on the Whitney Bank subpoena was outstanding at the time of the hearing, and (3) the taking of DD's deposition.