# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-648

**ANTHONY JAMES LANDRY, ET AL.**

**VERSUS**

**GUZZINO COMMERCIAL, L.L.C., ET AL.**

### Consolidated with 23-649

**EULA BARTIE, ET AL.**

**VERSUS**

**GUZZINO COMMERCIAL, L.L.C., ET AL.**

### Consolidated with 23-650

**WANDA ANDERSON, ET AL.**

**VERSUS**

**GUZZINO COMMERCIAL, L.L.C., ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2013-2985, 2013-3206, 2013-3564
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**ELIZABETH A. PICKETT**
**CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Charles G. Fitzgerald, and Wilbur L. Stiles, Judges.

**AFFIRMED AS AMENDED.**

**Ralph E. Kraft**
**Brian E. Legé**
**Kraft, Legé LLC**
**600 Jefferson Street, Suite 410**
**Lafayette, LA 70501**
**(337) 706-1818**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
**Guzzino Commercial, L.L.C.**
**Utility Truck and Equipment Company**

**Thomas J. Gayle**
**Gayle Law Firm, LLC**
**713 Kirby Street**
**Lake Charles, LA 70602**
**(337) 494-1220**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
**Guzzino Commercial, L.L.C.**
**Utility Truck and Equipment Company**

**J. Lee Hoffoss, Jr.**
**Donald W. McKnight**
**Lee Hoffoss Injury Lawyers, LLC**
**517 West College Street**
**Lake Charles, LA 70605**
**(337) 433-2053**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
**Anthony James Landry, et al.**

**Charles B. Cappel**
**1011 Lakeshore Drive, Suite 500**
**Lake Charles LA 70601**
**(337) 491-6996**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
**Anthony James Landry, et al.**

**PICKETT, Judge.**

Two defendants appeal the trial court's judgment finding them solidarily liable with a third defendant and awarding damages to over fifty plaintiffs for medical issues, property damage, and nuisance caused by the three defendants' operation of a petroleum coke (pet coke) facility in the plaintiffs' neighborhood.

## FACTS

In *Landry v. Guzzino Commercial, LLC*, 20-206 (La.App. 3 Cir. 12/16/20), 317 So.3d 645, *writ denied sub nom. Guzzino Commercial, LLC.*, 22-635 (La. 6/22/22), 339 So.3d 645, (hereinafter referred to as *Landry I*), another panel of this court affirmed the trial court's determination that the three defendants, Guzzino Commercial, LLC (GC), Utility Truck and Equipment Company (UTEC), and Industrial Carbon Services, LLC (ICS), are solidarily liable for damages to the ten plaintiffs without addressing the merits of the trial court's conclusion. The panel also amended the assessment of property damages to two plaintiffs and affirmed all other damage awards. The panel also determined the comparative fault of each defendant had to be assessed and assessed fault as follows: GC, 25%; UTEC, 25%; and ICS 50%.[1]

In *Landry I*, the panel described the defendants' pet coke operations, stating: "Between 2011 and 2013, UTEC was engaged in the packaging and transportation of the coke for ICS. In 2013, ICS took over the processing of the coke until 2015, when that activity ended at the GC warehouses." *Landry I*, 317 So.3d at 649. Processing the pet coke created a black dust. Testimony shows that people in the neighborhood began noticing the pet coke dust (sometimes referred to as "dust")

---

[1] On April 18, 2023, the trial court issued an amended final judgment assessing fault in accordance with the panel's opinion.

on their property in 2012 and that by mid-2015 the dust had subsided. Accordingly, the pet coke dust was dispersed in the neighborhood for approximately three years.

The pet coke dust dispersed throughout the neighborhood and created additional work for the plaintiffs to maintain the interior and exterior of their homes. Initially, the plaintiffs did not know what the pet coke dust was, other than it was not ordinary dirt. They were concerned because they did not know whether the dust was harmful to them and their families and/or their property. Many of the plaintiffs suffered physical effects as a result of the pet coke dust. "The plaintiffs presented the testimony of Dr. Michael Crouch, a toxicologist, who identified eye, ear, nose, throat, and lung irritation as well-recognized problems associated with any particulate matter, not just petroleum coke." *Landry*, 317 at 650.

The trial court conducted a second bench trial in late June and early July 2020 to assess damages for additional plaintiffs and issued its judgment in April 2023.[2] GC and UTEC filed a motion appealing the judgment in June 2023. In December 2023, GC filed a "Suggestion of Bankruptcy" in the Western District of Louisiana, and in January 2024, UTEC filed a petition for bankruptcy. The bankruptcy court lifted the automatic stay in the bankruptcy proceedings to allow this appeal to proceed.

GC and UTEC now assign five errors with the trial court's judgment which present the following issues for our review:

1) Did the trial court err in finding the defendants solidarily liable to the plaintiffs?

2) Did the trial court err in awarding damages to plaintiffs whose claims had been dismissed on a motion for partial summary judgment?

3) Did the trial court err in awarding property damages for air conditioning units without expert testimony?

---

[2] In February 2023, counsel for ICS withdrew as counsel of record herein.

4) Did the trial court err in awarding damages for medical conditions beyond the trier of fact's common knowledge?

5) Were the trial court's nuisance damage awards excessive?

## DISCUSSION

*Solidary Liability*

In the prior appeal, GC and UTEC assigned error with the trial court holding all the defendants solidarily liable to the plaintiffs and not apportioning fault among them. The panel considered these issues together without specifically stating all three defendants could be held solidarily liable. Here, GC and UTEC argue the trial court erred in finding them solidarily liable because the plaintiffs failed to prove they conspired with one another and caused the pet coke to be disbursed in the neighborhood surrounding its facility, as required by La.Civ.Code art. 2324.

The trial court made the following findings of fact as to the relationships among the defendants:

> Beginning in 2011, Defendants, Guzzino Commercial, LLC (Guzzino) and Utility Truck and Equipment Company (UTEC) began operations at a site of three warehouses on Industrial Avenue off of Highway 14 in east Lake Charles, Louisiana. Initially, the operation was the storage of bulk petroleum coke dust. It evolved into the drying and bagging of the bulk material and storing the bags of coke. At all times the coke was owned by Industrial Carbon Services (ICS). Mr. Philip Guzzino, the individual running Guzzino and UTEC was paid by the ton to process the bulk coke. The arrangement between Guzzino and ICS was formalized by written contract effective November 1, 2012.
>
> . . . .
>
> The evidence established liability under La. C.C. arts. 667-668. Guzzino, UTEC, and ICS all knew or should have known that the operations in the warehouses adjacent to a residential neighborhood would present a nuisance caused by coke dust emissions. The same defendants failed to take reasonable steps to contain and suppress the dust. They eventually got around to it, but it took years, and in the

3

meantime the operations presented an ongoing nuisance to the residents.

Louisiana Civil Code Article 667 outlines limitations on a landowner's use of his property, stating:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.

GC and UTEC argue the plaintiffs did not prove their actions satisfy the requirements of La.Civ.Code art. 2324 which states, in pertinent part:

> A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
>
> B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.

*Khoobehi Properties, L.L.C. v. Baronne Development No. 2, L.L.C.*, 19-278, pp. 11-12 (La.App. 5 Cir. 12/18/19), 288 So.3d 224, 232-33 (emphasis added), addressed what is necessary to prove a claim of civil conspiracy explaining, in part:

The actionable element of a conspiracy claim is not the conspiracy itself; rather it is the tort that the conspirators agreed to commit and actually commit, in whole or in part, causing plaintiff's injury. [La. C.C. art. 2324. *Khoobehi Properties, LLC v. Baronne Dev. No. 2, L.L.C.*, 16-506 (La.App. 5 Cir. 3/29/17), 216 So.3d 287, 298, *writ denied,* 17-893 (La. 9/29/17), 227 So.3d 288, 298]. To establish a conspiracy, a plaintiff is required to provide evidence of the requisite agreement between the parties. *Thomas v. North 40 Land Development, Inc.*, 04-610 (La. App. 4 Cir. 1/26/05), 894 So.2d 1160, 1174.

A conspiracy under La. C.C. art. 2324 requires a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing. *Boudreaux v. Jeff*, 03-1932 (La. App. 1 Cir. 9/17/04), 884 So.2d 665, 672. A party's agreement to participate in a conspiracy to commit fraud requires a determination of subjective facts. *Proof of a conspiracy may be inferred from the defendant's knowledge of the impropriety of the actions taken by a co-conspirator. Id.*; *Thomas*, 894 So.2d at 1174. A conspiracy may be proven by circumstantial evidence, including highly suspicious facts and circumstances. *Lomont* [*v. Bennett*, 14-2483 (La. 6/30/15), 172 So.3d 620, 629, *cert.denied*, 577 U.S.1139, 136 S.Ct. 1167, 194 L.Ed.2d 178 (2016)]; *Hardy v. Easterling*, 47,950 (La.App. 2 Cir. 4/10/13), 113 So.3d 1178, 1184.

Jurisprudence interpreting and applying La.Civ.Code art. 667 addresses the propriety of holding landowners and their tenants solidarily liable. In *Kenner Plumbing Supply, Inc. v. Rusich Detailing, Inc.*, 14-922 (La.App. 5 Cir. 9/23/15), 175 So.3d 479, *writs denied*, 15-2110, 15-2112,15-2115 (La. 2/5/16), 186 So.3d 1164, 1165, two brothers owned and operated two businesses. One business owned the building which the other business leased to operate an automotive body shop. Both brothers had managerial responsibilities in both businesses and were involved in supervising the day-to-day activities of the tenant's business. Accordingly, the brothers knew the tenant's employees heated bumpers to remove dents which could result in a fire on the premises. Citing *Yokum v. 615 Bourbon St., L.L.C.*, 07–1785 (La. 2/26/08), 977 So.2d 859, the fifth circuit found it was reasonable to conclude that the landowner "knew *or should have known* of (its lessee's) employee's negligent activity taking place on its property, and that (the landowner)

5

failed to exercise reasonable care to prevent the resulting damages to Plaintiffs caused by those activities." *Id* at 494. The court affirmed the trial court holding the landowner solidarily liable with its tenant under La.Civ.Code art. 667.

In *Landry I*, 317 So.3d at 652, this court determined:

> Each of these enterprises were [sic] aware of the condition of the buildings, the need for appropriate precautions, and the nature of the material with which they were working. UTEC physically transported and packaged the material. It supplied protective equipment for its employees, indicating knowledge of the nature of petroleum coke. UTEC and ICS processed the material for about an equal amount of time, but UTEC did so at ICS's direction. GC, while not engaged in the processing of the coke, was the owner of the building and aware of the nature of petroleum coke and that it was being processed on its premises.

Having reviewed the jurisprudence discussed above and the factual findings in *Landry I*, we affirm the determination that GC and UTEC are solidarily liable with ICS for the plaintiffs' damages.

### *Damages for Claims Dismissed on a Motion for Summary Judgment*

In their second assignment of error, GC and UTEC argue the trial court committed legal error in awarding damages to plaintiffs whose claims had been dismissed with prejudice on a motion for summary judgment. A partial summary judgment is governed by La.Code Civ.P. art. 1915 and does not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay. La.Code Civ.P. art. 1915(B)(1). "In the absence of such a determination and designation, any such order or decision shall not constitute a final judgment for the purpose of an immediate appeal and may be revised at any time prior to the rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties." La.Code Civ.P. art. 1915(B)(2). Therefore, "It is well-settled that prior to final judgment a [trial court] may, at its discretion and on its own motion, change the result of

interlocutory rulings it finds to be erroneous." *Vasalle v. Wal-Mart Stores, Inc.*, 01-0462, p. 5 (La. 11/28/01), 801 So.2d 331, 334.

For these reasons, the trial court did not err in reconsidering its initial ruling on the defendants' motion for partial summary judgment and awarding damages to plaintiffs whose claims were dismissed in the judgment granting partial summary judgment.

### *Damages*

In their petition, the plaintiffs requested the following damages: diminution of property value; damage to property; nuisance; emotional distress; battery; remediation costs; medical expenses; loss of use of property; loss of consortium; and pain and suffering. The defendants assign error with the trial court's damage awards for (1) air conditioner repair or replacement without expert testimony, (2) medical conditions beyond the knowledge of the trier of facts, and (3) exceeding the damages awarded by the trial court in *Landry I*.

#### *Damages for Air Conditioning Units*

GC and UTEC argue the trial court erred in awarding damages to some plaintiffs for damages to their air conditioners based on the plaintiffs' testimony alone. In *Landry I*, the panel held the trial court erred in awarding damages to a married couple for replacing the motor on an air conditioning system, finding the plaintiffs' testimony alone was insufficient to prove their claim by a preponderance of the evidence. In reaching this conclusion, the panel observed "Air conditioner condensers fail without the presence of particulate matter and are more complex systems about which most people know little." 317 So.3d at 651. Accordingly, the panel amended the damage award in favor of the couple to exclude the trial court's award for their air conditioner condenser.

The trial court made ten "special damage awards for Plaintiffs['] expenses related to dust remediation, cleaning, etc." The defendants assign error with the following five special damage awards:

Carrie and Henry Withers                 $12,528.67

Shirley Jones                            $ 3,000.00

Ladone Avery                             $ 7,000.00

Ronald and Lavergne Celestine            $ 3,000.00

Russell Deshotels                        $ 2,500.00

The plaintiffs counter that, unlike the awards made by the trial court in *Landry I*, these awards are lump sum awards with no indication of what the awards represent and argue there is no way for this court to conclude the awards include air-conditioner related damages.

Lump sum or in globo awards for general and specific damages are permissible. *Johnson v. Henry*, 16-271 (La.App. 1 Cir. 10/31/16), 206 So.3d 916. Such awards cannot be reversed without showing the trial court abused its discretion in making the award. *Id*. A detailed analysis of a lump sum award must establish an abuse occurred; otherwise, the award will stand. *Id.*

This rule typically applies to lump sum awards that include general and special damages; however, under the facts of this case, we find it applies to the trial court's special damage awards to the enumerated plaintiffs. After the first trial, the trial court made lump sum general damage awards and itemized "special damage awards for plaintiffs' expenses related to dust remediation, cleaning, etc." In doing so, the trial court specifically awarded damages to one plaintiff for an air-conditioner. The trial court did not follow the same format herein. Rather, it made lump sum special damage awards.

8

To begin, we find the defendants' allegations do not apply to two plaintiffs' awards. First, Ms. Jones testified she did not replace her air conditioning unit because she lives on Social Security benefits and could not afford to replace it. The defendants do not refute her testimony and have not established the trial court awarded her damages for an air conditioning unit. Second, Mr. Celestine testified he changed his air conditioning unit and duct work in his home for $1,900.00. He also explained he is the maintenance supervisor of an apartment complex and is in charge of all the air conditioning work at the complex. The defendants did not challenge his testimony. Accordingly, Mr. Celestine's testimony satisfies the criteria set forth in *Landry I* for replacing an air conditioning unit, and the trial court did not err in awarding him damages for his air conditioning unit.

Ms. Withers testified that she and her husband changed two air conditioning units in their home and presented a receipt in the amount of $980.98, which represents the purchase of only one air conditioning unit. The trial court awarded Ms. Withers and her husband special damages totaling $12,528.67. This award is more than twelve times the cost of the air conditioning unit and represents many other items such as a video camera Ms. Withers used to film the defendants' operations and the coke dust throughout the neighborhood and her home. Based on Ms. Withers' testimony, the award also included expenses for preparing, copying, and disbursing handouts to establish the full extent of the defendants' activities and her efforts to have the facility/pet coke operation shut down, along with expenses she and her husband spent for cleaning their home.

Ms. Avery testified she paid $900.00 to have her air conditioning repaired. She further testified she replaced one-half of her roof in 2017 because pet coke dust remained on the roof, which had been replaced after Hurricane Rita in 2005. She also had her house pressure washed and painted. Ms. Avery stated the amounts

9

she paid for the pressure washing and painting but not what she paid to have her roof replaced. She also acknowledged she had the interior of her home painted after Hurricane Harvey in 2017, but there was no clarification as to when the pressure washing and painting expenses were paid.

Mr. Deshotels testified he changed his air conditioning unit but was not asked, and did not state, the amount he paid to replace it. He also testified that due to the pet coke dust, he pressure washed his house, painted it, and replaced the flooring in the house.

For these reasons, the defendants have not established these plaintiffs' special damage awards include expenses for air conditioning unit repairs or replacement, and they are affirmed.

### *Damages for Medical Conditions beyond the Trier of Fact's Knowledge*

In this assignment of error, the defendants argue the trial court erred in awarding damages for some of the plaintiffs' medical issues and/or conditions because their alleged injuries are not commonly associated with pet coke dust. They assert seven of the plaintiffs' general damage awards should be reversed because their awards include damages for complaints and/or conditions that are beyond the complaints and conditions commonly associated with exposure to pet coke dust.

In *Landry I*, 317 So.3d at 650, this court addressed when expert medical testimony is necessary to prove a claim for medical damages, explaining, in part:

> While expert medical evidence is sometimes essential, it is self-evident that, as a general rule, whether the defendant's fault, was a cause in fact of a plaintiff's personal injury or damage may be proved by other direct or circumstantial evidence. *Jordan v. Travelers Ins. Co.,* [257 La. 995], 245 So.2d [151] at 155 [La.1971]; See Prosser, Torts, § 41, p. 269 (5th ed. 1984) ("Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. But on medical

> matters within common knowledge, no expert testimony is required to permit a conclusion as to causation.") (Footnotes citing authorities omitted.) cf. *Carpenter v. Nelson,* [257 Minn. 424,] 101 N.W.2d [918] at 922 [(1960)], and authorities cited therein.

*Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993). Thus, a trier of fact can consider causation proven based upon areas that lie within common knowledge.

In considering this assigned error, we review the following awards in light of all the trial court's general damage awards which range from $2,500.00 to $50,000.00, with the majority of the awards ranging from $5,000.00 to $7,500.00. We have also considered awards made to plaintiffs in other cases for damages caused by defendants whose actions have caused nuisance, inconvenience, and injuries similar to what the plaintiffs herein experienced. In doing so, we are mindful "a defendant takes his victim as he finds him; when the defendant's tortious conduct aggravates a pre-existing injury or condition, he must compensate the victim for the full extent of this aggravation." *Id*. at 1003.

Shirley Jones was awarded $6,000.00 in general damages. The defendants argue the trial court's award improperly included an award for sialdenitis, inflammation of the salivary glands, because Ms. Jones did not present expert medical testimony to establish this condition was caused by the pet coke dust. Ms. Jones was approximately seventy-one years old when the pet coke dust became a problem in her neighborhood. She complained the coke dust affected her terribly, causing dry eyes, dry mouth, and voice changes. She also complained of aggravated sinus issues and breathing problems, which she attributed to the pet coke dust, stating she did not have breathing problems before then. She went to the eye doctor in 2013 for her dry eyes and was given eye drops that she used twice a day. Ms. Jones further related she was diagnosed with stones on her salivary glands which were treated with surgery and therapy. She also testified she had to clean her

11

home much more often than usual because of the coke dust. Considering Ms. Jones' advanced age, her dry eyes, aggravated sinus issues, breathing problems, and burden of additional cleaning, which she endured for three years, we cannot say the trial court's general damage award of $6,000.00 included an award for the stones on her salivary glands. In doing so, we find it more likely than not that Ms. Jones' award would be greater if the trial court included damages for the nodules on her salivary glands, the required surgery, and therapy.

The trial court awarded Ladone Avery $8,000.00 in general damages. The defendants argue this award improperly includes damages for heart-related issues that Ms. Avery related to the pet coke dust without sufficient medical evidence establishing a link between the two. Ms. Avery lived in her home for twenty-six years before the coke dust infiltrated the neighborhood and her home. She testified that she had stints implanted in her heart when she was younger and that after being exposed to the pet coke dust she developed breathing problems which required a pacemaker defibrillator be implanted in her heart. Ms. Avery did not present expert testimony connecting the implant to the pet coke dust. She recanted on cross-examination her testimony that the pet coke dust affected her heart. Moreover, a close reading of her testimony indicates her implant procedure was performed near the time of trial not between 2012 and 2015. Ms. Avery also testified, however, her sinuses were aggravated by the coke dust and that at times she had trouble breathing and often had to sleep in a recliner. Like other plaintiffs, she also had to perform more cleaning to maintain her home. As with Ms. Jones, in light of Ms. Avery's other complaints of sinus issues and breathing issues and her award of $8,000.00, we cannot say the trial court's award includes an award for her heart problems and the pacemaker and defibrillator those issues required.

Waterine Guidry was awarded $7,500.00 in general damages. The defendants contend the trial court's damage award is excessive in light of the fact that she was diagnosed with leukemia and had chemotherapy when the pet coke dust was prevalent and that her illness contributed to the limitations she endured at that time. Ms. Guidry lived in her home over forty years. She testified her chronic allergies were aggravated by the pet coke dust and the pet dust caused her extra stress. She acknowledged she had to stay indoors due to her leukemia, which was diagnosed in 2012, and required chemotherapy. She developed a skin rash which she acknowledged was caused by her cancer medication. Although Ms. Guidry admitted her leukemia caused her problems unrelated to the pet coke dust, we recognize that due to her leukemia and required treatment, she likely endured more stress and inconvenience due to the pet coke dust than healthy plaintiffs endured. Accordingly, we cannot say the trial court erred in awarding her $7,500.00 in general damages.

The trial court awarded Selena Heckard $8,500.00 in general damages. The defendants argue her award includes damages for an abscessed tooth not proven to be medically related to her pet coke dust exposure. Ms. Heckard testified the pet coke dust caused her to have allergic reactions in her eyes and nose with swelling. She did not have allergy issues previously and explained she had never experienced these symptoms before. She testified the swelling caused excruciating pain in her face and eyes. A picture of her face was shown to the trial court. On one occasion, her husband brought her to the emergency room for the pain and swelling. He testified her eyes were swollen shut and stated the doctor at the hospital diagnosed her with an abscessed tooth. Ms. Heckard did not testify her abscessed tooth was caused by the pet coke dust, but she did testify her severe allergies continued until the pet coke dust abated. She also testified she missed not

13

being able to go outside which she greatly enjoyed. Under these facts, we do not find the trial court awarded her damages for an abscessed tooth.

The defendants next assert the trial court erred in awarding Clifton Stevens $7,500.00 in damages, arguing the award includes an award for his diagnosis of conjunctivochalasis (excessive folds of skin on eyelids), which was not proven to be medically related to the pet coke dust. Mr. Stevens was retired and very involved in an outreach ministry. At the time of trial, he had lived in his home forty-five years. He testified the coke dust created much more work and caused many problems for him and his wife Flora. He drove a white Cadillac, which he washed every day for his ministry work. He also had to clean the roof, cement, and inside of his home much more often. Mr. Stevens testified the pet coke dust required him to frequently see an eye doctor. He acknowledged he may have had his eye condition before the pet coke dust became a problem, but he emphasized that the coke dust greatly aggravated the condition and that he could hardly go outside without his eyes being irritated. For these reasons, we cannot say Mr. Stevens' award compensates him for causing his eye condition, not exacerbating the condition.

Flora Stevens was awarded $7,500.00 in general damages. The defendants argue the trial court's award includes damages for nodules on her voice box that were not medically proven to be caused by the pet coke dust. Ms. Stevens testified the nodules pre-existed the presence of the pet coke dust but also explained the coke dust aggravated her condition such that she could not talk at times and limited her time outdoors and talking. She also testified the pet coke dust irritated her eyes. Lastly, Ms. Stevens testified she no longer has nodules on her voice box. In light of this evidence, we do not find that the trial court awarded Ms. Stevens damages for nodules on her voice box.

14

Lastly, the defendants urge the trial court erroneously awarded George Taylor damages in the amount of $4,000.00 for teeth pain. Mr. Taylor testified the pet coke dust aggravated his sinus problems, causing sinus drainage which in turn caused his teeth to hurt. He took over-the-counter drugs for six to eight months. In addition to his sinus problems, Mr. Taylor had to clean his home and change the air conditioner filters and holders in his home more often. In light of other damage awards for sinus problems and pain, we cannot say the trial court awarded Mr. Taylor damages for teeth pain.

### *Excessiveness of Damage Awards*

In their final assignment of error, the defendants assert the trial court's damage awards are excessive, citing the damage awards made to the plaintiffs in *Landry I* without referencing any particular awards or the basis for this contention.

In *Boyance v. United Fire & Casualty Co.*, 23-442, p. 9-10 (La.App. 3 Cir. 4/3/24), 387 So.3d 586, 597, *writ denied*, 24-632 (La. 9/24/24), __ So.3d __, 2024 WL 4273513, this court observed:

> General damages are meant to return the plaintiff to the circumstances he was in just before his injury occurred. *Anderson v. State of Louisiana*, 18-01 (La.App. 3 Cir. 8/29/18), 258 So.3d 925. The assessment of general damages must include consideration of "the severity and the duration of the [injured party's] pain and suffering." *Guidry v. Allstate Ins. Co.*, 11-517, p. 14 (La.App. 3 Cir. 12/21/11), 83 So.3d 91, 102, *writ denied*, 12-225 (La. 3/30/12), 85 So.3d 121. "Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *McGee v. A C And S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775. A plaintiff seeking an award for loss of enjoyment of life must show her lifestyle was detrimentally affected or that she had to forgo activities or pleasures she formerly enjoyed because of the injury. *Id.*, 933 So.2d 770. To establish she experienced a loss of enjoyment of life, a plaintiff must establish the nature and severity of her injury and how the injury affected her prior lifestyle. *Id.*

When determining whether a trial court erred in awarding damages, an appellate court must consider whether the trier of fact clearly abused its discretion

when awarding damages by reviewing prior awards made to plaintiffs in similar situations, together with the facts and circumstance in the case being reviewed. *Pete v. Boland Marine & Manufacturing. Co., LLC*, 23-170 (La. 10/20/23), 379 So.3d 636. We can only consider prior awards if we find the trier of fact abused its discretion and only then do we determine the appropriate damage award. *Id.*

In *Landry I*, the trial court awarded general damages for nuisance claims and medical claims which, when added together, ranged from $1,000.00 to $10,000.00 per person for nuisance claims and $1,000.00 to $2,500.00 per person for medical claims. The plaintiffs argue our review of the plaintiffs' award herein should not be based solely on the trial court's damage awards in *Landry I*, asserting the trial court's role as trier of fact in both trials supports the trial court's damage awards herein. They point out the trial court stated in its reasons for ruling: "These awards are made without reference to prior awards, but are based solely on the evidence presented during the June 29–July 1, 2020 trial."

The highest award in *Landry I* was an award of $20,000.00 to a couple who lived across from the pet coke facility for forty years for their nuisance claim and $2,000.00 to the wife for sinus issues. The trial court stated in its Reasons for Ruling:

> They should not have had to face this easily preventable nuisance. The fact of the nuisance is clear. However, the Court is less impressed with the presence of coke inside the home. While it is clear coke could be tracked in, it is less clear that dust could infiltrate through walls and windows.

> The trial court also made the following awards:

1) $5,000.00 jointly to another couple who lived near the facility two years for nuisance and $2,000.00 each for sinus issues;

2) $5,000.00 to an individual for nuisance and $2,500.00 for aggravation of sinus issues;

3) $2,000.00 to a couple far from the facility for nuisance and $1,000.00 to the wife for aggravation of her sinus issues;

4) $2,500.00 to an individual who was not "front line" for nuisance.

The record before us shows, however, that essentially every plaintiff in this case testified the pet coke dust infiltrated the interior of their homes through their air conditioners and otherwise. The coke dust required them to clean much more frequently than before the pet coke facility began operating. Moreover, the plaintiffs' testimonies establish the pet coke dust was very fine and would "cake," requiring extra cleaning and scrubbing to remove it from the interior and exterior surfaces on which it landed. Accordingly, we attribute the trial court's higher damage award herein, at least in part, to its determination that the pet coke dust infiltrated the interior of the plaintiffs' homes requiring them to clean their homes *inside and outside* more frequently and arduously.

In *Jones v. Capitol Enterprises, Inc.*, 11-956 (La.App. 4 Cir. 5/9/12), 89 So.3d 474, *writ denied,* 12-1634 (La. 10/26/12), 99 So.3d 651, the plaintiffs were members of a class action seeking damages caused by sandblasting and painting operations performed by the defendant on a water tank adjoining their properties over a period of four months. The plaintiffs sought damages for physical pain and suffering, property damage, mental anguish, and nuisance. Each class representative was awarded $20,000.00 in damages. The fine abrasive silica used to sandblast the water tank and the paint used to paint it were easily dispersed from the work site to the plaintiffs' properties which required them to clean their homes inside and out more frequently. The products also concerned the plaintiffs because they did not know whether the products used in the operation posed health issues for them. Moreover, the class representatives testified the silica dust and paint caused "eye irritation, respiratory problems, aggravation of sinus condition,

headaches, skin irritation, etc." *Id.* at 504. Some of the representatives saw a doctor for their physical injuries, while others treated themselves with over-the-counter medications. As herein, the defendants in *Jones* also argued their operations did not cause, but only aggravated, some of the class representatives' conditions. The trial court rejected that defense and cast defendants with damages for aggravating pre-existing conditions.

The operations in *Jones* were also loud and noisy which aggravated and stressed the plaintiffs. The pet coke dust was not loud or noisy; however, it affected the plaintiffs' lives for three years, not four months. For these reasons, we find the damage awards in *Jones* provide guidance for reviewing the trial court's awards herein.

In *Broussard v. Multi-Chem Group, LLC*, 17-985 (La.App. 3 Cir. 7/11/18), 255 So.3d 661, *writ denied,* 18-1347 (La. 11/14/18), 256 So.3d 258, this court reviewed and affirmed damages awarded to plaintiffs who were exposed to chemicals dispersed into the air and who breathed particulates floating in the tainted air that caused them to suffer burning eyes, breathing problems, etc. While the cause of the plaintiffs' damages in this case is not the same as in *Broussard*, some of the plaintiffs' symptoms and complaints are similar. Therefore, we find they provide guidance for our review of the trial court's general damage awards.

One plaintiff who lived 2.67 miles from where the chemical release occurred was awarded $7,000.00 for her complaints that lasted approximately four months. She saw the black smoke and smelled a strong odor at the time of the release. She complained of feeling dizzy and drowsy, having a headache, dry mouth, and difficulty sleeping. Three plaintiffs in the vicinity of the explosion were awarded $5,000.00 each for the following complaints that also lasted approximately four months: (1) smelled fumes in car as driving home; immediately felt nauseated, then

18

felt poorly; (2) smelled the fumes, experienced a bad taste in the mouth, nausea, some vomiting, dizziness, and a headache that lasted for weeks; (3) eye pain and irritation treated with eye drops and headaches.

Two plaintiffs were awarded $2,500.00 each. One initially had a dry taste in the mouth and an unsettled stomach, then saw a doctor two months later and felt better at that time. The second was outside working in the yard and detected a smell that irritated her eyes and caused them to burn and water excessively. Another plaintiff was awarded $2,000.00 for complaints of feeling poorly, burning in the throat and nausea along with aggravation of pre-existing asthma and was diagnosed with bronchitis which improved within two months.

The plaintiffs' exposure to the pet coke dust and the problems it created for them lasted much longer than what the plaintiffs in *Broussard* experienced. Accordingly, we find it was appropriate for the trial court to award higher damages to most of the plaintiffs herein than the plaintiffs were awarded in *Broussard*.

Having previously reviewed and rejected the defendants' arguments that the following damage awards include awards for medical conditions beyond the common knowledge of the trial court, we now affirm them, finding they are not excessive:

| | |
|---|---|
| Shirley Jones | $6,000.00 |
| Ladone Avery | $8,000.00 |
| Waterine Avery | $7,500.00 |
| Selena Heckard | $8,500.00 |
| Clifton Stevens | $7,500.00 |
| Flora Stevens | $7,500.00 |
| George Taylor | $4,000.00 |

We now review the remainder of the trial court's damage awards:

**Carrie Withers**                                                  **$50,000.00**

Mrs. Withers moved into her home in 1976. Thirty-six years later, her home and her life were inundated with pet coke dust. She testified her home, which was just 50 feet from the pet coke dust facility, meant a lot to her and that she and her husband could not afford to relocate to get away from the coke dust. Beginning in 2012, the coke dust became noticeable to her and her husband. They had never seen so much coke dust. Mrs. Wither worked, but Mr. Withers was retired. Both testified the extensive coke dust caused them to squabble over keeping their home clean. Mr. Withers cleaned during the day, but when Mrs. Withers came home at the end of the work day she complained that he was not keeping the house clean. They both cleaned but could not keep the coke dust under control.

Mrs. Withers essentially became a political activist for her neighborhood. She contacted the Department of Environmental Quality, the United States Environmental Protection Agency, city, parish, and state officials; attended zoning meetings and city council meetings; bought a video camera and filmed the coke being released from the facility; took pictures of the coke dust at various times; prepared, printed and handed out over 100 flyers; and prepared and had petitions signed by neighbors. She worked hard to get the facility closed. The defendants sought variances for their operations and moved the operations from one building to another then another before all their requests for variances were denied, and the operations ceased. Mrs. Withers testified it took "a lot of footwork, a lot of time, a lot of money" to get the facility closed. She produced pictures of how the coke dust invaded their home and accumulated on everything inside and outside of it. She also produced pictures showing how quickly the coke dust accumulated and how thick it was.

Mrs. Withers became very sick in 2012 and testified she thought she would die but could not go to the doctor because her deductible was so high. She did have a prescription called into her pharmacy, which relieved her symptoms. She had severe sinus issues the duration of the defendants' operations. She testified that between her full-time job and the situation created by the pet coke dust, she began to feel paranoid.

Mrs. Withers testified she and her husband could not sit outside or barbeque because of the coke dust. She also testified she and her husband were very upset in December 2012 because the coke dust prevented them from having their children and grandchildren celebrate Christmas with them in their home. Instead, they traveled to Texas for the holiday.

**Henry Withers                                          $40,000.00**

Mr. Withers' testimony was much like Mrs. Withers' testimony in many respects. He testified Mrs. Withers "squawked" because he did not keep the house clean enough while she worked. Mr. Withers assisted Mrs. Withers in shutting down the pet coke operations shut down taking photographs of the pet coke dust in different locations in the neighborhood. He also testified his sinus infection in 2012 was so bad he could hardly breathe and had to sleep sitting up. He related he had never had sinus problems in his life and explained his sinus issues ceased in 2015. Mrs. Withers also testified regarding Mr. Withers illness, stating his sinus infection in 2012 was so bad he had trouble walking.

Mr. Withers testified the coke dust "drastically" changed their lives. He "loved" going outside, having family over, and cooking outside. The coke dust prevented them from enjoying those activities. He explained their carpet is still full of coke dust that they could not get out even though they vacuumed and

21

shampooed the carpet. He also related the coke dust is visible when Mrs. Withers vacuums it, but they cannot afford to have it replaced.

**Melvin Holloway**                                        **$15,000.00**

Mr. Holloway bought his house in 1969. The coke dust made it hard for him to breathe, and he developed breathing issues which were diagnosed as COPD and/or asthma by different doctors. Due to the coke dust, he did not open his windows as he liked. Though he kept his windows closed, he testified his air conditioner pulled coke dust into his house. He also complained that some of his fruit trees died. He had to have his roof changed and his house painted.

**Wanda Anderson**                                       **$14,000.00**

Ms. Anderson lived in her home for forty years; she sought treatment with a pulmonologist in 2011–12. She also had sleep apnea and acknowledged the coke dust did not cause her sinus problems but testified it aggravated them. Ms. Anderson further testified the coke dust affected her ability to enjoy her property, explaining she was a "stickler" for cleanliness and that the appearance of her home caused her stress when entertaining visitors.

**Jaquenetta Williams and Family**              **$23,000.00**

Ms. Williams rented a home across from the facility. She lived with her three daughters, Kierra Dodd, Ja'mya Dodd, and Breaunna Paul. Ms. Williams was awarded $14,000.00, and her daughters were each awarded $3,000.00. The coke dust prevented them from going outside for activities and entertaining. Ms. Williams did not allow her daughters to go outside to skate or ride their bikes or scooters and had to cancel a birthday party for one of the girls. She developed an upper respiratory infection and bronchitis which she never had previously. Her daughters also became sick and had to be treated by their doctor. Like their mother, they had never had upper respiratory issues before.

**Donald Hanchet**                                      **$11,000.00**

Mr. Hanchet grew up in and lived in his home for fifty-three years. There was coke dust in his yard and on his house and the north side of his roof. He developed sinus problems and dry eyes which he had never experienced before. He complained about the work he had to do to maintain the property, e.g., cleaning with bleach and replacing boards on his home due to the coke dust. He complained he could not enjoy his outdoor kitchen to cook and serve barbequed food and fried fish any longer.

**Laura White**                                       **$11,000.00**

Ms. White was born and raised in her house. The coke dust aggravated her asthma and required medical treatment. Her daughter lived with her, and she also had breathing problems that required medical treatment. Ms. White complained the dust changed the color of the wall paint. She changed her roof, pressure washed, and painted her home. She complained the coke dust kept her from enjoying the outdoors and walking in the neighborhood.

**Eleck Brown, Jr.**                                  **$10,000.00**

Eleck was young and in school.  The coke dust aggravated his asthma and caused him to wheeze heavily. He testified he is allergic to pollen, but the coke dust aggravated his asthma more than pollen does. He had to use albuterol more frequently and sleep with his father's sleep apnea mask. Because of the coke dust, his father would not allow him to have friends over, and he had to go to his friends' homes. He complained he could have fished more with his father if they had not had to spend so much time cleaning in and around their house.

**Pamela Thomas and Family**                          **$26,000.00**

Mrs. Thomas; her husband, Tommy Jr.; and their two children, Jasmine and Tommy III lived close to the facility. Mrs. Thomas testified for all of them via

23

Zoom because they could not appear at trial due to COVID. Mrs. Thomas testified she and her husband had to clean more often outside and inside. They pressure washed their home two to three times a year versus one time per year before 2012. The coke dust caused heightened sinus irritation for her. Tommy III's asthma was exacerbated, requiring him to use an inhaler more often and have nebulizer treatments. He and Jasmine had to take Singulair daily for their allergies. To allow her children to enjoy the outdoors, she took them to parks away from the neighborhood. Tommy III and Jasmine were each awarded $3,000.00. Pamela and Tommy Thomas Jr. were each awarded $10,000.00.

**Lucille Fradieu**                     **$8,500.00**

Ms. Fradieu lived close to the coke facility. She owned her home for forty plus years. She complained the coke dust was everywhere inside and outside her home, requiring her to clean more often. The coke dust affected her breathing. She had to use an inhaler and also had to use oxygen to sleep at night. Ms. Fradieu's enjoyment of her property was curtailed because she could not sit outside or barbeque.

**Russell Deshotels**                     **$8,000.00**

He lived in his home approximately one block from the facility for thirty-seven years, having been raised there and then buying the home from his grandparents.  Due to the pet coke dust, Mr. Deshotels pressure washed his home every six months. He and his wife painted their home, replaced the outside trim and replaced the carpet and flooring inside the home. Mr. Deshotels sold the bulldogs he raised because he was concerned as to how the coke dust would affect them. His wife, Candice, was also awarded $8,000.00. She could not be present in court due to her employment which provided COVID-related care. Mr. Deshotels testified on her behalf for her property damage claims.

**Destiny Glasgo** $7,500.00

Ms. Glasgo lived with Ronald Peterson and their infant son when the facility was operating. Their son developed breathing issues and had to be treated at a hospital. Ms. Glasgo had to use a nebulizer for their son. At the time of trial, the child still had breathing issues and had to take two medications. The coke dust also caused Ms. Glasgo respiratory issues that required her to use an asthma pump. She testified the coke dust scared her as a first-time mother.

**James Franklin** $7,500.00

The coke dust irritated Mr. Franklin's eyes, causing them to burn and itch. It aggravated a prior injury caused by a previous incident near an oil spill in 2010. Mr. Franklin testified he had to power wash and really scrub his house to get it clean. He had to scrub his outdoor furniture using SOS pads because a dishcloth and soap did not get them clean. He also worked hard to keep his cars clean.

**Jeanette Franklin** $7,500.00

Mrs. Franklin testified that due to the coke dust, she developed a continuous dry cough, which was worse at night. She also testified she and Mr. Franklin had to clean inside and out more often because the pet coke dust smeared when wet and was harder to clean. They paid to have some cleaning done on their property. The coke dust curtailed their outdoor activities and entertaining. Mrs. Franklin attended community meetings about the coke dust and having the operations stopped.

**Juana Felton** $7,500.00

The pet coke dust aggravated Ms. Felton's sinus issues and caused a sinus infection that did not clear after going to two different doctors. Her sinus issues caused her to cough heavily at night and disturbed her sleep. Her chest and ears also hurt. She had a lot of sinus drainage and had to take prescription medications,

including steroids and antibiotics, which did not resolve the issues as they did normally.

**Kevin Heckard**                                    **$7,500.00**

Mr. Heckard testified the coke dust required him to perform much more cleaning than usual, including daily dusting and mopping. He explained the coke dust blew into their home through the central air conditioner, so he also cleaned the air conditioner vents. He cleaned outdoors, including the patio furniture. He and his wife did not have gatherings at their home until after pet coke operations stopped in 2015.

**Jennifer White**                                    **$7,000.00**

Ms. White had pre-existing asthma that the coke dust aggravated which caused her to have trouble breathing and required her to use her inhaler more often. Due to her asthma, she could not take her baby outdoors. She had to clean more often, including pressure washing her white house. She also did some repainting.

**Shawna White**                                    **$7,000.00**

Ms. White also had to clean more often. She testified cleaning disturbed the coke dust which aggravated her allergies, requiring her to change her inhaler. She loved going outdoors, but the coke dust prevented her from doing so. Ms. White worried about her son and pet cat's welfare and was disappointed her son could not go outdoors and interact with nature as she would have liked.

**Ronald Celestine**                                    **$7,000.00**

Mr. Celestine lived in his home for twenty-nine years. He had to clean more frequently and developed allergies and coughing problems for which his doctor prescribed a nasal spray and allergy medication. He could not sleep at night due to the coughing; he further testified he coughed all day every day until he got the nasal spray. He did not have coughing issues before being exposed to the pet coke

26

dust. He pressure washed, primed, and painted his house. He also pressure washed the sidewalk and back deck. He testified the coke dust was trapped in the insulation of his air conditioning unit, and he could not get it out. He replaced the unit himself.

**Laverne Celestine**          **$7,000.00**

Ms. Celestine did not testify at trial, but Mr. Celestine testified on her behalf. He explained the coke dust aggravated her and caused her to have allergy issues for which she took over-the-counter medications. Mr. Celestine further testified that at times he coughed so much, his coughing aggravated her.

**Lindsey Gomes**          **$6,000.00**

Ms. Gomes moved in with Waterine Guidry, her grandmother, in 2012. She developed a bad cough, and black particles would discharge from her mouth when she coughed. She loved to go outdoors but could not because of the coke dust. She had to help her grandmother with extra cleaning and described the coke dust as smearing around.

**Elisha Brown**          **$6,000.00**

Elisha and her siblings lived with their father who restricted them to stay indoors if not going to work. They all loved barbequing and having family gatherings, including birthday parties, but those were terminated. Elisha developed an upper respiratory infection that was harsher on her chest than the usual infections she had. It was harder for her breathe. Her doctor prescribed medication and Tylenol. Her father made them all help to keep the house clean.

**Elexis Brown**          **$6,000.00**

Elexis and her siblings began living with their father in 2012. The coke dust was unusual. It concerned her, and she did not go out often because the coke dust would be tracked into the home. Her father made them stay inside, which she did

not like. He also did not let them have friends visit. She had a lot of sinus issues in 2012-2013, and her asthma was exacerbated. She had to get a new albuterol pump.

**Helen Washington**                    **$5,000.00**

Mrs. Washington liked to walk in the neighborhood for daily exercise and often walked near the facility. She became concerned when she saw workers at the facility in Tyvek suits. She had pre-existing allergies and skin sensitivities. Her skin turned red, became dry and flaky, and itched. Her doctor prescribed steroids, a prescription cream, and Selsun Blue to wash her skin. She did not have a rash on her arms or legs until she walked near the facility, so she stopped walking. Her regular allergy issues lasted longer than usual, e.g., runny nose and itchy eyes.

**Louanna Brown**                    **$5,000.00**

Ms. Brown lived forty-five years in her home. She lived with her husband and their son who has Down Syndrome. Her husband developed allergy issues which they treated themselves. Their lives were affected by the coke dust. They cleaned more often, and their son was not allowed to go out as much as he had before the coke dust became a problem.

**Mary Ann Thomas**                    **$5,000.00**

Ms. Thomas smelled and saw the coke dust inside and outside of her home. The coke dust aggravated her asthma. She began having breathing trouble every other day, which was not normal. She also sneezed and coughed constantly. She power washed her house more often and washed her car every other day because of the dust.

**Kenyetta Thomas**                    **$5,000.00**

Kenyetta is Maryann's daughter. She helped her mother clean. The coke dust required them to clean more often to get the gritty coke dust off the walls and other surfaces in the home. The coke dust aggravated her sinus issues.

**Kayla Thomas and Sons**                    **$5,000.00 each**

Kayla lived with her mother, Destiny Glasgo, close to the plant. She had congestion and asthma because of the coke dust. Her sons Markeithen and Markaven also lived there. They were each awarded $5,000.00 in general damages. The coke dust aggravated Markeithen's asthma, and Kayla had to take him to the hospital because he started having trouble breathing. He had to use a nebulizer and albuterol to alleviate his asthma and breathing issues. The unusual dust caused the house and cars to get excessively dirty, so they had to clean much more often. They also washed the outside of the house more often, two times per year. According to Kayla, Markaven did not have any medical issues as a result of the coke dust. They moved from Ms. Glasgo's home in 2013 to another neighborhood. Based on this evidence, we affirm the trial court's awards to Kayla and Markeithen but reduce Markaven's award to $2,500.00.

**Ronald Peterson**                    **$5,000.00**

Mr. Peterson lived with Destiny Glasgo and their son. The coke dust caused him to be congested. He complained the coke dust was unusual and caused their house to get excessively dirty; the carpet looked black from the coke dust. They had to increase their cleaning inside and outside. He washed the outside of the house more often, twice a year.

**Viola Beverly**                    **$5,000.00**

Ms. Beverly owned her home thirty-five years. She complained that her house was black inside and out and that the black coke dust stuck to the outside, requiring them to clean more often. The coke dust aggravated her pre-existing health issues, a skin condition and breathing issues. She had to have her house cleaned inside and out more often. She testified the coke dust caused her to move from Lake Charles in 2015.

**Elmore and Pandora Johnson**                          **$4,000.00 each**

Mr. Johnson and his wife, Pandora, own their home. They have a daughter who lives with them. Neither he nor Mrs. Johnson had any physical or medical complaints as a result of the coke dust. He described trying to clean the coke dust off the walls of the home and stated the coke dust seemed to blend into the paint when he scrubbed the walls. He pressure washed the exterior of the home. Mr. Johnson testified they also owned rental property in the neighborhood that he had to clean because his tenants complained. He, his wife, and their daughter quit going outside due to the thickness of the coke dust on their patio.

**Paul Washington**                                     **$3,500.00**

Mr. Washington testified the coke dust required him to clean more often than usual and to wash his vehicle, patio cover, and outdoor storage building often. He described it as "constant upkeep." He did a lot of touch up painting. Later, he and his wife moved to Shreveport, and he testified that he had to repaint the house to sell it because he could not match the original color.

**Rosalind Jean**                                       **$3,000.00**

Ms. Jean rented her house. She had to hand-wash her white car. The coke dust on the house was very hard to clean with a water hose and nozzle, so her brother power washed it for her. The interior walls of the house are not as white as they were before. The coke dust caused her to have sinus issues. She also believed the coke dust caused her dormant eczema to flare up, but her doctor did not state so.

**Melody Carrier**                                    **$3,000.00**

Ms. Carrier testified the coke dust on her house was primarily on the roof, the left side and that toward the back of the house, the coke dust was really bad on the soffits and eaves. She borrowed a pressure washer to clean her house. She

really enjoyed sitting outside, especially in the mornings, but the coke dust prevented her from doing so.

**Robert and Maudry Alfred**           **$2,500.00 each**

Mr. Alfred and his wife, Maudry, lived in their home sixty years. Mrs. Alfred could not appear at the trial due to health issues. Mr. Alfred testified for himself and on behalf of his wife. They had to clean more often and pressure wash their house. He complained their vehicles were very dirty and testified they had to move a birthday party into their garage because the coke dust was like smoke under their outdoor tent. Mr. Alfred also testified he and Mrs. Alfred quit going outside because they believed it was not healthy for them to be outside in the coke dust.

For the reasons discussed, we reduce the trial court's general damage award to Markhaven Thomas from $5,000.00 to $3,500.00 and affirm all other awards.

## DISPOSITION

For the reasons discussed above, we affirm the trial court's holding Guzzino Commercial, LLC and Utility Truck and Equipment Company solidarily liable with Industrial Carbon Services, LLC and affirm all but one of the trial court's damage awards: the general damage award to Markhaven Thomas is reduced from $5,000.00 to $3,500.00. All costs of this appeal are assessed to Guzzino Commercial, LLC and Utility Truck and Equipment Company.

**AFFIRMED AS AMENDED.**